**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
NATALIE BONACASA,                                              :
                                                               :
                                    Plaintiff,                 :        Index No.:
                                                               :
                        v.                                     :        **COMPLAINT**
                                                               :
SKIFT, INC., RAFAT ALI and                                     :        **Jury Trial Demanded**
MICHAEL CUNNIFF, in their                                      :
individual and professional capacities,                        :
                                                               :
                                    Defendants.                :
------------------------------------------------------------------X

Plaintiff Natalie Bonacasa, as and for her Complaint in this action against Defendants

Skift, Inc. ("Skift" or the "Company"), Rafat Ali ("Mr. Ali") and Michael Cunniff ("Mr.

Cunniff") (together, "Defendants") hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      Front and center of the "About Us" section on the Skift website are the

Company's "Core Values," which are listed as:

      1.     Always come up with new ways & perspectives of looking at the world;

      2.     Humane, always default to making professional + personal lives of our team better;

      3.     Diverse, in all its glorious manifestations: we want to look like the world of travelers;

      4.     Accessible, as a culture to our team and as a brand to outsiders;

      5.     Always, always doing our own thing, without fear; and

      6.     Fuck it, let's do it.

2.     Unfortunately, the culture that Skift's executive leadership fosters is far from "humane," "professional" or "accessible," particularly for Skift's female employees.  The workplace does not at all reflect the sunny outlook on the travel and hospitality industry that Skift tries to project.  In fact, the values publicly touted by Skift could not be further from the truth for women working with the Company's top executives.

3.     Ms. Bonacasa was hired as the 16th employee at Skift, and worked tirelessly to grow the start-up into the successful global travel marketing company that it is today.

4.     Sadly, her years at the Company were marked by constant gender-based harassment, bullying and discrimination by Skift's top executives, CEO Rafat Ali and CFO Michael Cunniff.  These male executives subjected Ms. Bonacasa to a drumbeat of condescension, belittling and hostility that was not visited upon her male colleagues, and which it appears they would not have dared to engage in towards other men.

5.     After this persistent discriminatory treatment had worsening effects on her health and well-being, Ms. Bonacasa retained counsel in March 2019 and sent a confidential letter to Skift's leadership, including Mr. Ali and Mr. Cunniff, detailing her legal claims and calling upon the Company to address them.

6.     In direct and obvious retaliation for engaging in this legally protected activity, Ms. Bonacasa was abruptly terminated without notice just two months later, on May 8, 2019.

## NATURE OF THE CLAIMS

7.     This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress unlawful employment practices committed against Ms. Bonacasa in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").

## ADMINISTRATIVE PREREQUISITES

8.      On June 12, 2019, Plaintiff filed a Complaint in New York State Supreme Court (the "State Court Complaint") alleging violations of the NYSHRL and the NYCHRL arising out of the same nucleus of operative facts.

9.      On July 2, 2019, Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") alleging, among other things, violations of Title VII.  The EEOC subsequently issued Plaintiff a Notice of Right to Sue ("Right to Sue"), received on October 29, 2019.

10.     Plaintiff now files this Complaint, alleging violations of Title VII, within 90 days of the issuance of the Right to Sue.  Plaintiff may file a motion in New York State Supreme Court to voluntarily dismiss that her State Court Complaint without prejudice.  After the dismissal of the State Court Complaint, Plaintiff would seek to amend this Complaint to include her NYSHRL and NYCHRL claims.

11.     Plaintiff has complied with any and all other prerequisites to filing this action.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII. The Court also would have supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a) in the event they are in the future added to this Complaint.

13.     Venue is proper in this County pursuant to 28 U.S.C. § 1391(b) substantial part of the events or omissions giving rise to this action, including employment practices alleged herein, occurred in this district.

## PARTIES

14.     Plaintiff Natalie Bonacasa is a former employee of Defendants.  Ms. Bonacasa currently resides in Nassau County, New York.  At all relevant times, Ms. Bonacasa fell within the definition of a "person" and/or an "employee" under all applicable statutes.

15.     Defendant Skift is a media, marketing and research company that deciphers and defines trends across the travel industry.  It is headquartered at 145 West 30th Street in New York City, New York.  Skift is a foreign business corporation organized under the laws of the State of New York.  At all relevant times, Skift was an "employer" within the meaning of all applicable statutes.

16.     At all relevant times, Defendant Rafat Ali was the Chief Executive Officer ("CEO") of Skift.  In this capacity, Mr. Ali participated directly in the unlawful conduct described herein.  Upon information and belief, Mr. Ali resides in New York County, New York. At all relevant times, Mr. Ali was an "employer" within the meaning of all applicable statutes.

17.     At all relevant times, Defendant Michael Cunniff was the Chief Financial Officer ("CFO") of Skift.  In this capacity, Mr. Cunniff participated directly in the unlawful conduct described herein.  Upon information and belief, Mr. Cunniff resides in California.  At all relevant times, Mr. Cunniff was an "employer" within the meaning of all applicable statutes.

## FACTUAL ALLEGATIONS

### I.     MS. BONACASA'S EXCEPTIONAL CAREER AT SKIFT

18.     In 2008, Ms. Bonacasa graduated from State University of New York at Albany *cum laude* with a Bachelor of Arts in Business Marketing.  She went on to work at PetCareRx, Inc. as a Marketing Manager, and in 2013 she joined Mediabistro Inc. as a Senior Marketing Manager.  She soon became Barnes & Noble's Direct Marketing Manager, where she managed

4

an email program of over 12 million subscribers which brought in over $15 million in revenue annually.

19.     In 2015, Ms. Bonacasa was approached by Mr. Ali on LinkedIn to interview at Skift, and shortly after she was hired as the Senior Marketing and Growth Manager, just the 16th person to join the Company.  Over the next three years, Ms. Bonacasa was promoted annually: in June 2016, Ms. Bonacasa became the Director of Marketing; in September 2017, Ms. Bonacasa became the Senior Director of Marketing; and in June 2018, Ms. Bonacasa was promoted to Vice President of Marketing.

## II.     MS. BONACASA IS TARGETED WITH ABUSIVE TREATMENT AS A WOMAN AT SKIFT

20.     Unfortunately for Ms. Bonacasa, her outstanding performance record did not insulate her from the discriminatory treatment women often faced at Skift.

21.     Indeed, during Ms. Bonacasa's four-year tenure at Skift, Mr. Ali harassed and verbally abused Ms. Bonacasa and other female employees daily.  He did not speak to male employees or colleagues in a similarly hostile or abusive manner, and this was a well-known fact among the employees at Skift.

22.     By way of example only, Mr. Ali repeatedly belittled Ms. Bonacasa in front of her Marketing team and the entire office, saying things such as:

- **Don't speak when you are not being spoken to.**

- Don't interrupt me, this is not a discussion.

- **You don't know what you're doing**; I expect better from you.

23.     Mr. Ali also berated Ms. Bonacasa in emails and on Slack messages on the thinnest of pretexts, such as forwarding him an email that he found to be "**a waste of his time**."

24.     Mr. Ali regularly responded to emails and Slack messages with bullying statements that he directed towards the Company's female employees, including Ms. Bonacasa, such as the following:

- Tackle on your end instead of forwarding me and wasting my time.[1]

- **Don't double guess me. Enough.**

- This is not a Democracy. **End of discussion.**

25.     It was well-known at Skift that Mr. Ali addressed female employees in a particularly aggressive and patronizing manner.  In fact, his condescending tone and behavior towards women was so routine and such a consistent part of his general demeanor that it was seen as just another incident of such behavior when **Mr. Ali put up a decal of a witch on the women's bathroom** (in contrast to a decal of a superhero on the men's bathroom).

26.     Female colleagues often remarked to Ms. Bonacasa **that Mr. Ali "would never dare to speak to the guys like this**," and that "**If he were a boyfriend**, **we would never put up with this level of disrespect**."

27.     By way of example only, in an email to Ms. Bonacasa's female colleague, Mr. Ali wrote:

> I am open to all rational discussions on sponsorships, **but any public show of defiance -- perceived or real -- to my authority to make decisions**, **I don't usually take well**. And wish neither I nor you had to do it publicly, but it happened.

28.     At one point during Ms. Bonacasa's employment at Skift, the office morale among women was so low that female employees created a lunch group called "Ladies who Skift" to discuss their concerns.

---

[1]     This was in response to a question Ms. Bonacasa asked about a shared job responsibility.

29.     This endeavor was intended to allow female employees to have their voices heard, but was quickly shut down by the Company when it became clear that the forum was being used as an opportunity for women to vent their many frustrations and anxieties regarding Mr. Ali's sexist conduct.

30.     In January 2018, the five female employees who were reporting directly to Mr. Ali had become so despondent and distressed from their daily interactions with Mr. Ali that the Executive Team decided to have them all report to Ms. Bonacasa instead.

31.     In a Company-wide email sent on January 9, 2018, Mr. Ali attempted to put a positive spin on this conspicuous change and announced that Ms. Bonacasa would be leading the all-female marketing team.  This group included five women who had formerly been reporting to Mr. Ali: Ping Chan, a Senior Designer; Andrea Yang-Yanez, a Junior Designer; Syia Lewis-Doryumu, the Director of Strategic Operations; Amy Thorkilsen, a Project Manager; and Melissa Jimenez, an Event Planner.

## III.    MS. BONACASA SUFFERS PHYSICALLY AND EMOTIONALLY FROM THE CONSTANT GENDER-BASED HARASSMENT

32.     By way of background, Ms. Bonacasa is 33 years old and was diagnosed with Cystic Fibrosis ("CF") at the age of 16 years old.  CF is a genetic disease that is chronic and progressive.  The disease primarily affects the pulmonary and gastrointestinal systems and requires close medical supervision.

33.     CF requires twice daily airway clearance with Vest therapy and nebulized medication.  As such, Ms. Bonacasa performs airway clearance twice daily with both her high frequency chest vest therapy and nebulizer compressor.

34.     As with many chronic illnesses, stress, lack of sleep and anxiety exacerbate the symptoms of CF and can make it nearly impossible to function on a normal level.

35.     Ms. Bonacasa informed the executive team, including Mr. Cunniff, about her CF condition and the many health-related challenges she faces daily around one year after she started working at Skift.

36.     Soon after that, Ms. Bonacasa complained about Mr. Ali's conduct to Mr. Cunniff, Carolyn Kremins, Skift's President, and Jason Clampet, Skift's Chief Product Officer. Ms. Bonacasa told Mr. Cunniff on multiple occasions in 2017 that Mr. Ali's treatment of her was causing undue pressure and anxiety.

37.     In December 2017, Ms. Bonacasa became so upset that, under Ms. Kremins's advisement, she wrote a long letter to Mr. Ali detailing how stressed and miserable she constantly felt working for him.  After Mr. Ali received this letter, the executive team decided to have Ms. Bonacasa start reporting to Mr. Clampet.

38.     Ms. Bonacasa began reporting to Mr. Clampet in January 2018.  However, Ms. Bonacasa's workload did not decrease and she still had to interact with Mr. Ali very frequently.

39.     As a result of this toxic work environment, Ms. Bonacasa has suffered various physical effects, including the fact that she has ceased menstruating entirely.

40.     Ms. Bonacasa saw several specialists multiple times in 2017 and 2018 and was told repeatedly that the underlying cause of this physical change was unquestionably her stressful work environment.

41.     Ms. Bonacasa told Mr. Clampet that she had stopped menstruating in or around April 2018.  Unfortunately, the senior leadership team continued to condone Mr. Ali's harassment and hostile conduct towards Ms. Bonacasa.

42.    Similarly, female colleagues have told Ms. Bonacasa that **they started losing hair**, **suffered from panic attacks and became insomniac** soon after starting work at Skift, and particularly after working with Mr. Ali.

## IV.    MS. BONACASA ENGAGES IN PROTECTED ACTIVITY

43.    On March 12, 2019, Ms. Bonacasa, through counsel, sent a letter to Mr. Cunniff, making a written complaint of gender discrimination.  In this letter, Ms. Bonacasa also informed Mr. Cunniff and the Company that she was represented by counsel and that she had been subjected to gender discrimination and harassment in violation of city, state and federal laws.

44.    Ms. Bonacasa also explained in this correspondence that the discrimination and hostile treatment she was being subjected to by Mr. Ali and the company were causing her to have serious health issues, *i.e.* extreme stress and anxiety and failure to have normal menstruation.

45.    Since March 12, 2019, the harassment and bullying Ms. Bonacasa experienced throughout her tenure at Skift only got worse.  Mr. Cunniff and Mr. Ali engaged in a concerted effort to create a paper trail against Ms. Bonacasa (and, no doubt, in order to make her miserable and perhaps induce her to quit) by constantly attacking her with emails over petty issues that beforehand she was never subjected to in her four-year career at Skift.

46.    By way of example only, on March 25, 2019, Mr. Cunniff emailed Ms. Bonacasa the following:

> Hey Nat,
>
> I noticed Gabi picked up the check for Amy's lunch.  When you are with the team, you should always pick up the check. It provides for better expense transparency to the exec team.
>
> Thanks, Michael

47.     This demonstrated that Ms. Bonacasa was being closely monitored and scrutinized to an extent that she had not previously been before she retained legal counsel.

48.      As another example, on March 27, 2019, Mr. Ali told Ms. Bonacasa that an email her marketing team had sent out to drive sales was "too long," and that "we can do better than this, years into doing this."  The marketing email in question was in a format and length that Ms. Bonacasa and her team had used multiple times and which had proved to be effective.

49.     Ultimately, in fact, the same email drove 45 sales, which brought in $45,000 in revenue to Skift.  This was a very strong result for the associated sales goals.

50.     In a particularly aggressive and hypocritical email chain on April 4, 2019, Mr. Cunniff blamed Ms. Bonacasa and her team for not accepting American Express credit cards for certain international Skift Forums.[2]

51.     Ms. Bonacasa was put in the uncomfortable position of reminding Mr. Cunniff that it had been his responsibility to fill out the paperwork to make the website portals American Express-accessible.  Ms. Bonacasa also explained in her responding email to Mr. Cunniff that she had followed up with him to see if he had been able to accomplish this task and had not heard back from him.

52.     On April 25, six days after Good Friday, Mr. Cunniff emailed Ms. Bonacasa the following:

> I just finished running payroll and tallied paid time off for this pay period.
> I noticed that the entire marketing team and events team were out on Good
> Friday.  As a company we try our best to support those who practice
> his/her faith.  As a practicing Catholic, I appreciate the company giving us
> this opportunity.  However, we cannot find ourselves in a position where
> there is no coverage in an entire department.  As a senior leader in the

---

[2]     A Skift Forum is a conference that covers the travel industry's trends to which many Skift subscribers are invited.  Ms. Bonacasa's team is responsible for organizing and publicizing the Skift Forums.

company, you are expected to manage the team in a manner that doesn't leave us with any coverage on a given day.  Going forward, I'd appreciate more attention to the needs of the business.

53.     Of course, not only had Ms. Bonacasa informed Mr. Clampet in advance that much of her team would be out on Good Friday in observance of the holiday, but she had also laid out a detailed plan of any action items that were typically tackled on Fridays and had prepared coverage and alternative timing for those responsibilities.

54.     Furthermore, Mr. Cunniff's email was plainly inaccurate, as Ms. Bonacasa's department included marketing and design, and the entire design team was in the office that day.

55.     This was evidently yet another attempt to hold Ms. Bonacasa and her all-female team to an unfair and discriminatory standard and unequal terms and conditions of employment, and to generate a pretext to retaliate against Ms. Bonacasa.

56.     Moreover, Ms. Bonacasa's marketing team was not the only team that was out of the office in observance of the holiday – almost the entire office was out.  Mr. Cunniff's email was directed at Ms. Bonacasa in obvious retaliation for retaining counsel.

57.     Most recently, on April 26, 2019, Mr. Cunniff sent Ms. Bonacasa a plainly retaliatory and threatening email filled with baseless performance criticisms about the forecasted target numbers and goals for ticket sales for one of the Skift Forums that Ms. Bonacasa's team handled.

58.     In the process, and in a transparent attempt to create a *post hoc* justification for his attacks, Mr. Cunniff materially altered the goals and process Ms. Bonacasa normally followed regarding the marketing efforts of the Skift Global Forums.

59.     By way of example, in 2018, before the very same event, ticket sales were at 65% of the forecasted goal and Mr. Cunniff adjusted the revenue goal number to the 65% mark in

order to demonstrate that the goal was met.  This is typically what had been done in the past at

Skift, as the Company customarily sets aggressive, aspirational targets that it knows its teams

will not be able to meet.

60.     In a back-and-forth email campaign, Mr. Cunniff now was telling Ms. Bonacasa

that the current projections for Skift Forum Asia and Skift Tech Forum (among other

"shortcomings") were not acceptable.

61.     The retaliatory motive for this shift was even more apparent when contrasted with

the handling of the sales team's targets, which was a team that Ms. Bonacasa did not manage.  In

late April 2019, the sales team had not met its goals and was 20% lower year-over-year for Skift

Forum Europe.  The sales team, which was a much larger team than Ms. Bonacasa's team, and

one that had outside sales support, was not similarly scrutinized or criticized for this

shortcoming.

62.     Ironically, throughout the spring of 2019, Ms. Bonacasa had sent Mr. Cunniff,

Mr. Clampet and Mr. Ali various plans on how marketing can be accelerated, yet all three of

them failed to approve proposals for increased discounting and adding Public Relations ("PR")

support for the marketing team.  Indeed, they all failed to respond to Ms. Bonacasa's request for

clarity on something as basic as a budget.

63.     Ms. Bonacasa was met with silence each time – on at least three occasions – when

she asked Mr. Cunniff, Mr. Clampet and/or Mr. Ali for a marketing budget.

64.     Ms. Bonacasa had worked at Skift for almost four years and had not received such

harsh and repeated transparently pretextual communications from Mr. Cunniff of this kind

before.

65.     In addition, Ms. Bonacasa had asked Mr. Cunniff on numerous occasions for the

updated number of shares which she was entitled to purchase from the Company.  Ms. Bonacasa

had been unable to fill out the requisite paperwork to purchase the stock options without this

updated number, which Mr. Cunniff refused to provide to her.

66.     This refusal was further obvious retaliation against Ms. Bonacasa for engaging in

protected activity in making her complaints and retaining counsel.  Ms. Bonacasa had no way of

knowing that her ability and opportunity to purchase the stock options would soon be voided by

further blatant retaliation by Skift and its executive management.

## V.     SKIFT TERMINATES MS. BONACASA IN TRANSPARENT AND OBVIOUS RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY

67.     On April 30, 2019, in response to the litany of questions Ms. Bonacasa was

receiving regarding the Skift Forum ticket sales and goals, Ms. Bonacasa sent a detailed plan

outlining her strategy to Mr. Cunniff.  She was again met with silence.  On May 7, 2019, Mr.

Cunniff requested that Ms. Bonacasa send him a detailed strategy again explaining how her team

planned to make up the supposed "deficiencies" in ticket sales for a few different Skift Forums

based on the previously inflated goals.

68.     Ms. Bonacasa replied point by point, explaining that she had repeatedly asked for

clarity on her budget, her target numbers, PR support and the approval from management to give

discounts.  All of these actions may have resulted in the Company's knowingly high goals being

reached, but were not acted upon by management.

69.     The following day, Mr. Cunniff sent Ms. Bonacasa the following email:

> In our call yesterday I asked you to provide a detailed plan on how you
> will make the revenue objectives for the rest of the year. I asked you to
> send to me by 9AM PT. Your response does not meet either request. I will
> reply to each point in line below. I know tomorrow is a WFH day for you
> but I need to meet with you in the office to discuss this. Please be there by
> 9:15 AM to meet with me.

70.      On May 8, 2019, Ms. Bonacasa attended the meeting with Mr. Cunniff and was

terminated without notice or warning.

71.     In this meeting, Mr. Cunniff told Ms. Bonacasa that the plans she had sent were somehow not sufficient to meet her targets and she was therefore being let go.  This was a thinly-veiled pretext for retaliation for engaging in protected activity.

72.     Mr. Cunniff and Mr. Clampet then met with the rest of Ms. Bonacasa's team and informed them that Ms. Bonacasa had been let go as part of the layoff resulting from the elimination of Skift Table.[3]  In Ms. Bonacasa's four years at Skift, she barely had anything to do with Skift Table.

73.     To add insult to injury, as Ms. Bonacasa left the office for the last time, her entire team (which was composed of women only), as well as women from the Sales team and SkiftX team walked her to the elevator, with several of them in tears.  One of her female colleagues screamed out in disbelief that Ms. Bonacasa was fired.  Mr. Cunniff watched the procession and walked towards the group of women gathered around the elevator doors and said, "**You have ten minutes, girls!**"

74.     The patronizing tone and choice of language – *i.e.*, referring to Ms. Bonacasa and her team as "girls" – provided a final illustration of the sexist culture and attitudes perpetuated by Skift's management, even amid the shock of Ms. Bonacasa's firing.

## FIRST CAUSE OF ACTION
### (Gender Discrimination in Violation of Title VII)
### *Against All Defendants*

75.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

---

[3]     As described on the Skift website, "Skift Table covers the news and ideas that shape today's restaurant industry from the people who also bring you travel insights at Skift. Our daily coverage and our newsletters capture trends, spotlight creativity and innovation, and help define the future of dining out. We are a resource for restaurant professionals, creatives, and anyone interested in the evolution of dining worldwide."

76.     By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of Title VII by subjecting her to disparate treatment based upon her gender, including, but not limited to, denying her equal terms and conditions of employment, harassing, bullying and intimidating her and subjecting her to disparate working terms and conditions while Plaintiff was working in Skift's office in New York.

77.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

78.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe physical injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**
***Against All Defendants***

79.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

80.     By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her complaints of discrimination by refusing to provide her with accurate and adequate feedback, harassing, bullying and intimidating her, subjecting her to unequal standards and conditions of employment and subsequently terminating her employment.

81.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct,

Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

82.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe physical injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm; for harm to her professional and personal reputation and loss of career fulfillment; for all non-monetary and/or compensatory harm, including, but not limited to, compensation for physical injury and mental anguish; and all other monetary and/or non-monetary losses suffered by Plaintiff;

D.      An award of punitive damages, to the greatest extent permitted by law;

E.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees and expenses to the fullest extent permitted by law; and

F.      Such other and further relief as Plaintiff is entitled to under applicable law, and/or

which the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: November 21, 2019
      New York, New York                  Respectfully submitted,

                                            **WIGDOR LLP**

                                            By: _____
                                               Lawrence M. Pearson
                                             Julia Elmaleh-Sachs

                                            85 Fifth Avenue
                                            New York, NY  10003
                                            Telephone:  (212) 257-6800
                                            Facsimile:  (212) 257-6845
                                            lpearson@wigdorlaw.com
                                            jelmaleh-sachs@wigdorlaw.com

                                          *Counsel for Plaintiff*